May it please the Court, I am Tim Zindel from the Federal Defender's Office, arguing on behalf of the appellant, Victor Camacho, and I'd like to reserve two minutes for rebuttal if I could. I'd like to think that what happened in this case is unique. The facts are very straightforward, and I do believe that the parties generally agree about them. Mr. Camacho, at least for the purposes of this motion, we agree about them. The fact is that he was engaged in some misconduct. That misconduct was not job-related. His supervisors, who worked for the government, learned about it and they punished him in several different ways by suspending his privilege to shop at the base. That was automatically done within a day. And then a month later, his supervisors met. They reduced his pay. They took from him $300 in incentive pay that he otherwise would have gotten. They downgraded his performance evaluation. And as a consequence, he's losing, on average, I think, $5,000 a year in income, potentially $50,000 over what's expected to be. Why is all that penal in nature? Because that's why. They're an employer. They have an obligation to deal with their employees. I agree with that. So why is it penal? Because it was intended to be penal by his supervisors, who are government employees. That's exactly what they say in their letter. They did this in order to punish him, knowing that that would be the punishment that would be or believing that that would be all the punishment that was imposed. Well, they didn't say it was penal. They described it as penal. They didn't think that further punishment or prosecution was necessary. That's what they said. Right. They did it in order to punish him. Right. And that's what they say. And the problem is that they were government actors at the time. Right. So, I mean, you concede, I think, that if they were private actors, none of the actions they would have taken could be considered punitive in the context of the Double Jeopardy Clause, right? Right. So why do you conclude that they were acting in the capacity of a sovereign rather than as an employer? Because, well, I don't think that there's – I understand that there are the three cases the government's relying upon that make the distinction between the government acting as the employer and the government acting as a sovereign. I think those cases are simply mistaken. There's no support for that in the Supreme Court doctrine. There's no support for that in this circuit. The problem with those cases, and this is hinted at in the Reyes case, which is probably the fullest discussion of the principle, is that the Fifth Amendment, which contains the Double Jeopardy Clause, is a restriction on the government, just like the Fifth Amendment also contains the Due Process Clause, which is a restriction on the government. There are things that, acting as an employer, the government cannot do that private employers can do. And one of those things is they cannot punish a person twice for criminal conduct. Just – they – I think in the Reyes case, they avert to – I find that difficult to accept, to be honest with you. Why is that, Your Honor? Well, what are they supposed to do? Are they supposed to hold off? I mean, this is to make a decision that it's either sort of a punishment as an employer or criminal punishment? I think they're – Well, what do they do? I mean, they just say, oh, maybe this is a case where we should not interfere because prosecution is appropriate, criminal prosecution. Well, I think what often happens, and I think we're dealing with an agency that doesn't have fixed regulations when we're dealing with the military for civilian employees, or at least none that are implicated in this case. But I think what you're saying is what often happens – They appear to have some. There was something, some words in here. I saw some reference to some regulation. Right. But it didn't make an end of the record. And that's – that's as it stands. But I think what often happens when you have a government employee accused in this conduct – for example, in Sacramento, we've had a series of scandals with our fire firemen have been accused of engaging in on-the-job misconduct. Typically, those firemen are placed on administrative leave, and then the investigation is done, and you determine whether you're going to, you know, if it rose to the level of criminal misconduct, be criminally prosecuted. And you can't fire them. Pardon? And you can't fire them. I'm not saying that you can't fire them. I think that probably if this – if this misconduct had been serious enough, it would have been sufficiently remedial to terminate Mr. Camacho. What if they'd done that? What if they'd fired him? Would your argument be the same here, that that would prevent a subsequent prosecution? I think that it probably would not be. If they fired him, assuming that they had cause to fire him, that his misconduct was job-related and was serious enough, that he posed some concern, either a security concern or fitness concern, and they had terminated him. What if he hadn't agreed? Then you would have the problem that it really is a remedy. But here, if you want to go ahead. What if he hadn't agreed to assign or to sign the acknowledgment of suspension of exchange privileges? They presented that to him and he said, no, I'm not signing that, and then they fired him. I don't see how that changes the equation. Well, here, he was – he was – among the sanctions was that his exchange privileges were suspended for a period of time. And in the record is a document that says, as part of that acknowledgement of having those privileges suspended, that he remained subject to possible prosecution by civilian and Federal authorities. Now, he had the option, I suppose, of not signing that, and as I follow through, I think they probably would have fired him if he had not signed that. And I'm asking if you think that firing him would have posed the same preclusion to a prosecution. I'm going to retreat to my earlier answer, which is that firing him, if that were appropriate under the circumstances given his misconduct, that would have been remedial. And I don't think it would have implicated double jeopardy concerns. I don't think they would have fired him. I don't understand. I'm sorry, but I want to stop you there. I don't understand the distinction you're drawing. You take someone and you reduce their pay, you reduce their privileges. That's not remedial, but if you fire them, it is remedial? If you – well, generally, yes. I think specifically, yes. In this case, they took money away. Right. Mr. Camacho read here. That's about as close as you can get to a monetary fine, which is a traditional criminal punishment, as you can get. If we were here, if all they had done to him was suspend his privilege to shop at the Base Exchange, I don't think that we would have a case. I think that the Schiller case that was decided seven, eight years ago where the woman's privileges to drive were restricted after she was stopped for drunk driving on a military base would have foreclosed that. And I think that, you know, that is a remedy. We don't want you in our store because we can't trust you. You've got caught stealing there. I think that that fits. But here, because of that, they also took money away from him. So if they take money away from him, but they don't fire him, it's double jeopardy. But if they take all of his money away by firing him, that is double jeopardy? I'm sorry. I mixed that up. I'm not making broad principles here. I'm dealing with one specific case. And I think that there are certainly situations where firing, termination is going to be an appropriate remedy. I think the district judge, when the woman attorney who filed the briefs argued that in front of the district judge, posed a hypothetical about what would happen if, in your office, some employee had stolen all the computers and the Federal Defender terminated him, would you then be prevented from prosecuting? Would the government then be prevented from prosecuting? I think in that hypothetical, the answer is no, because in that case, in that hypothetical, the termination is going to be fairly obviously remedial. You've stolen from your employer. We can't trust you to be in this office. So we're going to let you go. But what you have here is something a little bit different. You have a reduction. You have them taking money away from him to punish him for something that was not job-related. That's different also from the three cases the government is relying upon, McAllister, Reed, and Reyes, where the government is punishing and then later prosecuting for on-the-job misconduct. So let's say that off-duty he steals some plutonium and he gets fined for that. Same result. The government cannot prosecute him for theft of plutonium or any other crime if it has a monetary sanction on the job. I think I need more facts to flesh that out. Well, it's the same thing. I just changed the theft. Well, again, if the theft of plutonium raised concerns about having the employee in the workplace at all, then I think it depends on the facts of the case. I wanted to keep this narrow to the facts of this case. In this case we have to write a little more broadly than that, though. I hope we don't. But I think under the facts of this case what you have is you have government agents, the Lieutenant Colonel Koresh and his assistant, looking at Mr. Camacho and saying, we're going to punish you for what you did in various ways, not the suspension of the privileges, which was done by the base exchange immediately after the event, but by reducing his pay and taking away incentive pay. In fact, the $300 incentive pay reduction exceeds what would probably or what would be the minimum guidelines fine after he's prosecuted for this, which I think is probably in the $100 to $1,000 range. Your time has expired. I see that. Thank you. May it please the Court. I'm Samantha Sangler, assistant U.S. attorney, and I've been living with this case since it was filed. I think that the Court's analysis must start from the proposition that its jurisdiction is limited. If this double jeopardy claim is not colorable, then this Court lacks jurisdiction. I think the only reason that you might be able to find that the claim is colorable at all is that there isn't a clear Ninth Circuit decision that rejects an identical double jeopardy claim. What do we do with the letter from the superintendent and the commander? Are you referring now to the letter to the government? To the July 27th letter. Okay. Directed to the U.S. attorney, Travis M. Cody. Yes. That letter. So what do we do with that? That letter I think you should ignore. And here's why. Why? That letter was written after the institution of criminal proceedings. That letter has – is written by, yes, the immediate supervisors of Mr. Camacho, but its goal is an attempt to talk the U.S. Attorney's Office into dropping its charges or agreeing to some kind of lower disposition of the case rather than proceeding with the criminal prosecution. And I think instead the letter you should be looking at, besides the base commander's suspension of the privilege to shop at the base exchange, the next thing you should look at is the item number 24 in the excerpts of record, which is a July 18th, 2003 letter, a memo for the record regarding counseling of C.M. Sergeant Camacho. That letter paints an entirely different picture of what the supervisor, Korach, is thinking about. He's talking there about – I'm looking at the third paragraph down. The chief was aware of the severity of his actions and truly was questioning his own judgment. Although he was under a great amount of stress, family separation, I emphasize the fact that our senior leaders must continue to perform during times of adversity. He indicated that he was in a counseling program and that this incident would be addressed during his next session. Finally, in the very last paragraph, Commander Korach notes, The chief has unlimited potential, and I intend to follow up with him on his plan to rebuild his career and reputation as a trusted leader. This indicates that his supervisors are working with him, that he has been a valuable employee in the past, and when you look at his performance evaluations that are in pages 26 through 29 of the excerpts of record, you see that up until this incident, he was getting all nines. That's the outstanding, that's the highest rating that a person can achieve. He received that nine rating on all nine of the performance categories, and it was only after this incident that he had three of the nine categories downgraded. Two of them were downgraded to an eight, and one of them was downgraded to a seven. Now, that's just for the particular evaluation period. And it's possible that this man can rebuild, that he can overcome this problem, and that he can eventually even be considered for this promotion to the spot that he had previously been considered for promotion to. If he's able to reestablish the trust and continue to perform in an exemplary manner. Now, I think you need to also look at the nature of the consequences, the nature of the the sanction that was imposed. Yes, he had his base exchange privileges suspended. As I understand the defendant's briefs, they are not contesting that that does not pose a double jeopardy concern. So we can set that one aside. Instead, we need to look at the others. He received counseling. He had an incentive award reduced by $300. He was officially reprimanded, and he had his work performance appraisal downgraded. That's it. The effect of downgrading his work performance appraisal is that he may have an inability to compete, at least initially, for this promotion. And that is what results in his potential reduction or potential not being able to achieve an additional $5,000 of income per year. His pay wasn't reduced. Only this $300 incentive was reduced. All the rest of his pay is stays the same. He just was denied the opportunity, at least initially, for a promotion. But look at these things. They are all job action. They are all job-related. And if he had been a person who came on base because he was related to somebody that lived there, and he stole from the base exchange, he would have had his base exchange privileges denied. So that really can be just completely set aside. I think that when you start out, after you get over the jurisdictional hurdle, then you look at Hudson and how you apply those factors. And there is less guidance in the out-of-circuit cases that we've relied on, McAllister, Reyes, and Reed. And that's because those cases were not decided after Hudson. They were decided before Hudson. And your first determination that you have to make that Hudson identifies is what was the legislative intent in establishing the penalizing mechanism. Well, we don't have any legislative intent. We don't have regulations that we're applying. We simply have the government as employer. And I think that in that context, you can draw from the other decisions of the other circuits in saying that, well, what does the employer intend by this, by this type of action, by the by counseling an employee, by reducing an incentive award, by downgrading their performance appraisal? It's clear what that is. That's about the employment relationship between the employer who happens to be the government and the employee. The government there is doing the exact same thing that a private employer can do. And therefore, the purpose is clearly one having to do with the employment relationship and not having to do with the criminal punishment. The criminal punishment that is involved here is a completely separate thing. When somebody goes to the base exchange and shoplifts from it, there are employees that work at the base that are in charge of security. They monitor the cameras, and when they see somebody stealing, they contact the base police in essence. And the base police pursues the investigation. And then the base police refer it to their legal department, who refers it to the U.S. Attorney's Office for criminal prosecution. That's all separate and independent and apart from what may happen to somebody who's an employee on the base. If they're a military person, they might face court-martial. If or if they're just a civilian employee who also happens to be in the military, as with Mr. Camacho, then their choice was to not pursue the court-martial, which certainly would have raised a different issue regarding the double jeopardy. But instead, they pursued employment action. And so in getting to your second issue, that's if you find that there's a criminal purpose in the employer's action as employer, which I don't think you can find, then you determine has there some kind of punitive purpose in the employer's action that's been taken that would elevate it to a criminal purpose. And it takes the clearest proof of that. That is absolutely lacking here. There is just nothing at all. I mean, the closest you get is this letter that you referred to, Judge Fias, and that letter is written from the standpoint of somebody who apparently didn't realize or didn't think about the fact that a criminal prosecution might result, or maybe they just would like to see it not happen. But that's not that person's call to make. That is not the call of the person who is Mr. Camacho's immediate supervisor. They write, Administrative impunity of actions have already been administered in place of prosecution. These actions were intended as Chief Camacho's sole punishment and are sufficient discipline for the petty crime charge. Well, those people wrote that knowing that there's this separate process that happens on the base exchange with the base military police, et cetera. And it's hard to understand how they could say that. And in fact, at the government supplemental excerpt of Record 13, the base legal liaison writes a letter to the same person who was in our misdemeanor unit at the time, explaining to him that it was not the position of the Travis Air Force Base that this punishment that was meted out for Mr. Camacho in his civilian employment capacity, that that should substitute for the criminal prosecution, and that the legal department and the base commander stood by its decision to refer the case for criminal prosecution based on Chief Camacho's theft, where he was wearing his fatigues, from the base exchange. So this letter says those two people didn't have the right to speak for the government in saying that it was intended only to be the punishment that he have his – that he get counseling and that he get reprimanded, et cetera. Instead, they're saying, no, they didn't have that right. The Air Force wants him to be prosecuted criminally for his theft from the base exchange. Thank you, counsel. Thank you, Your Honor. We'll give you a minute for rebuttal. The problem here is that all the actions that were done, both the ones that were done back in 2002 immediately following the event, and then the institution of the misdemeanor case in 2003, were all actions that were imposed by the government. And the Fifth Amendment is a limitation on the government's ability to punish. If what is required in the law says what is required is the clearest proof that the actions were punitive, that's what this letter is. It's the clearest proof. And it may be that in retrospect or in hindsight, that Lieutenant Koresh and the other fellow, Master Sergeant Runow, were not authorized to do this, but that doesn't make it all right for the government to come in and punish Mr. Camacho a second time after its agents punished him. What they say here is that we did this to punish him, and they did that whenever. In August and September of 2002, it wasn't until the following year that the government comes in and says, guess what, Mr. Camacho, we're going to punish you again. The Double Jeopardy Clause does not allow that to happen. There is no authority, I think, in light of the cases that were cited and raised, to make a distinction between the government acting as an employer. Well, they may have thought as employers that these remedial actions were enough. No need to prosecute this guy. This is enough. That's a whole different question about whether or not, you know, it invokes Double Jeopardy under the Double Jeopardy Clause. Well, I think that in that letter they are also trying to make that point, but they say in no uncertain terms that we did this to punish him. I think that's the problem. And I do think that it's unique to this case. I think that a clear announcement that you've got to tread lightly will keep this situation from arising. Thank you, counsel. The case, Mr. Hirt, will be submitted. We'll hear argument next on the case of Brown v. Sprint United Management Service.
judges: Thomas, Paez, Burns